Bettye Keener **STEGMAIER**, etc., et al., Plaintiffs-Appellants,

v.

Jerry Pete **TRAMMELL**, etc., et al., Defendants-Appellees.

No. 77–1873.

United States Court of Appeals, Fifth Circuit.

July 2, 1979.

Leon Garmon, Gadsden, Ala., for plaintiffs-appellants.

Roger C. Suttle, James C. Stivender, Sp. Assts. for Atty. Gen., Gadsden, Ala., for defendants-appellees.

Before GODBOLD, SIMPSON and RONEY, Circuit Judges.

SIMPSON, Circuit Judge:

Appellant Bettye Keener Stegmaier commenced this action on November 11, 1976, against appellee Jerry Pete Trammell, then Circuit Clerk elect for Cherokee County, Alabama. Stegmaier sought general injunctive and other relief for alleged violations of the First and Fourteenth Amendments and 42 U.S.C. §§ 1983, 1985, 1986, and 1988. She alleged that Trammell violated her rights to freedom of belief, speech and association by threatening to discharge her as Deputy Circuit Clerk because she failed to support him in the election for the office of Circuit Clerk. The district court, pursuant to Federal Rule of Civil Procedure 65(a)(2), ordered the trial of this action on the merits consolidated with the hearing scheduled on appellant's application for injunctive relief. In its Memorandum of Decision, dated January 13, 1977, the district

court found appellant was entitled to none of the relief requested, holding that under *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), Trammell's replacement of Stegmaier was an "authorized patronage dismissal".

 We affirm, holding that a public employee occupying a position of confidence, loyalty, and trust by virtue of her status as the single deputy and assistant to an elected official may be discharged solely on the ground of political affiliations without infringing her constitutional rights.

## I. STATEMENT OF THE CASE

On March 18, 1974, appellant was appointed Deputy Circuit Clerk for Cherokee County, Alabama, by Fred Green, then Circuit Clerk. Green was defeated by appellee Trammell for the Democratic Party nomination for the position of Circuit Clerk in a primary runoff election held on May 25, 1976. In the November 2, 1976, general election Trammell was elected Circuit Clerk. One of his opponents was Green, who had run again as an independent.

After his election Trammell informed appellant that she would be replaced as Deputy Circuit Clerk on January 18, 1977, the date on which Trammell was to begin serving his elective term.[1] Thereafter, on November 11, 1976, appellant commenced this action seeking general injunctive and other relief for alleged violations of the First and Fourteenth Amendments and 42 U.S.C. §§ 1983, 1985, 1986, and 1988. She alleged that Trammell violated her rights to freedom of belief, speech and association by threatening to discharge her because she failed to support him for the office of Circuit Clerk.

In his answer Trammell admitted that he informed appellant she would be replaced, denied each and every other allegation con-

tained in the complaint, and noted that appellant had declined other employment in the office of the Circuit Clerk which he had tendered. Trammell raised several defenses. First, he asserted that as a newly elected Circuit Clerk, whose duties and responsibilities included judgment and policymaking decisions as well as the collection and safekeeping of public funds, he had the right to discharge appellant and appoint someone of his own choice. Second, Trammell contended that he was under a duty as the newly elected Circuit Clerk to select a qualified, competent individual in whom he had great confidence where his predecessor, Green, had been indicted for embezzlement.[2]

By way of affidavit in support of his motion for summary judgment Trammell stated that he intended to appoint Dean Perron to the position of Deputy Circuit Clerk. Mrs. Perron was one of the original candidates in the Democratic primary for the office of Circuit Clerk. In Trammell's opinion Perron was "an experienced businesswoman, fully competent to act as Deputy Circuit Clerk," and a person in whom he had much trust and confidence.

Trammell, by his affidavit, again denied that he wanted to discharge appellant because she failed to support his candidacy for the office of Circuit Clerk, but he did "recognize" that it was Stegmaier's duty and obligation to remain loyal to her employer, Fred Green, and to support him for re-election. Trammell also asserted that the position of Deputy Circuit Clerk is a policymaking position, involving obligations of trust. Furthermore, he claimed that the Deputy Circuit Clerk, as the chief assistant to the Circuit Clerk, enjoys a confidential relationship with the Clerk. Finally, Trammell argued that since the Deputy Circuit Clerk has the responsibility of running the Clerk's office in the absence of the Clerk, the Deputy's duties included various policymaking

---

**1.** "By reason of the indictment of the incumbent [for embezzling], the office became vacant and [Trammell] received an interim appointment prior to the term for which he was elected. He agreed to keep [Stegmaier] until the

commencement of such full term". District Court Memorandum of Decision, Record at 26 n. 1.

**2.** *See* note 1 *supra.*

decisions.[3] For all these reasons Trammell maintained that he had the legal right to select a Deputy Circuit Clerk of his own choice and preference.

This cause came on for hearing on January 10, 1977, pursuant to the district court's order of December 29, 1976, by which the trial of the action on the merits was advanced and consolidated with the hearing for interlocutory injunctive relief. *See* Fed. R.Civ.P. 65(a)(2). According to the terms of the district court's December 29th order, and as reflected by the record, the cause was submitted to the court for final decision on the merits upon conclusion of oral argument in the hearing for injunctive relief. The record does not reflect that any testimony was taken at this hearing, it appearing that the district court decided the issues raised on the basis of the appellant's complaint and the defendant's answer and

3. In his affidavit Trammell asserted that the Deputy Circuit Clerk has, among others, the following duties and responsibilities:
 1. Exclusive and bookkeeping responsibility of the office as suggested and recommended by the State Examiners.
 2. The collection, handling and safekeeping of public funds.
 3. The collection, handling and safekeeping of funds of private litigants.
 4. The duty of issuing warrants for arrests of individuals when the Circuit Clerk is absent or unavailable.
 5. The duty of making a judgment decision as to whether a warrant of arrest should or should not be issued when representatives of the District Attorney's office and the Circuit Clerk are absent or unavailable to make such decision and to prepare and issue such warrant after a decision has been made that the warrant should be issued.
 6. The Deputy Circuit Clerk occupies a policy-making position in carrying on and discharging the duties of the office of the Circuit Clerk.
 7. The Deputy Circuit Clerk occupies a position of trust in the carrying on and discharging the duties of the office of Circuit Clerk.
 8. The Deputy Circuit Clerk occupies a position of confidential relationship with the Circuit Clerk in carrying on and discharging the duties of the office of Circuit Clerk.

 Record at 20–21.

affidavit in support of his motion for summary judgment.

The district court found that appellant was entitled to none of the relief requested. The court held that under *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), Trammell's replacement of appellant was an "authorized patronage dismissal". This conclusion was attained through a two-step analysis. First, the district court found that the position of Circuit Clerk was a "policymaking position" as that term was envisioned in *Elrod.* Second, the position of Deputy Circuit Clerk was a "policymaking position" by virtue of statutory language and judicial interpretation vesting the deputy with duties and authorities concurrent with the Clerk. Hence, the district court concluded, since a "policymaking position" is specifically susceptible to "lawful patronage dismissals" under *Elrod*, Stegmaier was entitled to no relief.[4]

4. Although noting that *Elrod* might be distinguishable, the district court did not rest its decision on that basis.

 A credible argument could be made in this action based solely on the verified complaint and uncontroverted affidavits that Mrs. Stegmaier will not be (assuming Mr. Trammell carries through on his promised action) the victim of a patronage dismissal and thus *Elrod v. Burns, supra,* would be distinguishable on its facts. To this end the court would point out first, the plaintiff and the defendant are members of the same political party; second, the defendant offered the plaintiff another position in the Circuit Clerk's office; and finally, that the defendant attempted, albeit unsuccessfully, to secure additional funds for the Circuit Clerk's office from the Cherokee County Commissioners so that the plaintiff, if she accepted the proffered position, would suffer no loss of income. However, *the court does not find it necessary to base its conclusion that plaintiff in this action is not entitled to any relief on the theory that the present action is distinguishable from Elrod v. Burns, supra.* Even if the court places this action squarely within the ambit of *Elrod* —that is, assumes that the defendant's replacement of the plaintiff as the Deputy Clerk would in fact constitute a patronage dismissal—the criteria articulated in the *Elrod* opinion when viewed in conjunction with the relevant statutory authority fully satisfy the court that Mr. Trammell's replacing Mrs. Stegmaier as Deputy Clerk would be an authorized patronage dismissal.
 Record at 28 (emphasis added).

While appellant raises thirteen points of asserted error only one basic question emerges—whether the district court erred in finding that appellant fell within the policymaker exception in *Elrod v. Burns, supra,* and, therefore, was subject to patronage dismissal without infringement of her constitutional rights. We necessarily begin by reviewing *Elrod* and its progeny.

## II. *Elrod v. Burns* AND ITS PROGENY

### A. *Progenitor*

In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court of the United States held that patronage dismissals of public employees—discharging employees on a partisan, political basis—infringe first amendment interests. Respondents in *Elrod,* all Republicans, were employees[5] of the Cook County, Illinois Sheriff's Office under a Republican sheriff. When a Democratic sheriff assumed office respondents were discharged or threatened with discharge *solely* because they did not support, were not members of, or had failed to obtain sponsorship by one of the leaders of the Democratic party. Thereafter, respondents brought suit against the Sheriff of Cook County, the Mayor of Chicago, as well as the Democratic Organization and Democratic County Central Committee of Cook County. Their complaint alleged that they were discharged or threatened with discharge solely for the reasons that they were not affiliated with or sponsored by the Democratic party. They sought declaratory, injunctive, and other relief for alleged violations of the First and Fourteenth Amendments and 42 U.S.C. §§ 1983, 1985, 1986, and 1988.

On review the Supreme Court affirmed the Court of Appeals for the Seventh Circuit,[6] which had reversed the district court's dismissal of respondents' complaint for failure to state a claim upon which relief could be granted. Although five justices joined in the result, there was no majority opinion for the Court: Mr. Justice Brennan announced the Court's judgment in his plurality opinion, while Mr. Justice Stewart concurred in the result but refrained from joining in the plurality's "wide-ranging opinion". 427 U.S. at 374, 96 S.Ct. at 2690.[7]

The plurality opinion held that while patronage dismissals infringe first amendment interests, they could survive constitutional challenge if they furthered some "vi-

Bearing in mind that the district court's attempt to distinguish *Elrod* must be considered dicta, we note that the factual basis for distinguishing *Elrod* from the instant case may be a distinction without a difference. The fact that the public employee being discharged and the individual threatening discharge are members of the same political party is not dispositive if the consequence of the attempted patronage dismissal is politically coercive. *See Elrod v. Burns,* 427 U.S. 347, 355, 96 S.Ct. 2673, 2680–81, 49 L.Ed.2d 547 (1976) ("The cost of the practice of patronage is the restraint it places on freedoms of belief and association."). Furthermore, the fact that Stegmaier was offered other employment in the Clerk's office at a lower pay scale would not ameliorate any violation of her constitutional rights. *Cf. Johnson v. Bergland,* 586 F.2d 993 (4th Cir. 1978) (sufficient irreparable injury to warrant issuance of preliminary injunction where nonpolicymaker alleged that he was removed from his position for partisan political purposes, even though he was assigned to a new position at the same salary but with lesser responsibilities and prestige).

5. All respondents were non-civil service employees, not covered by any statute or regula-

tion protecting them from arbitrary discharge. Their respective duties and responsibilities as employees of the sheriff's office varied: Burns was Chief Deputy of the Process Division and supervised all departments of the sheriff's office working on one floor of a building housing the sheriff's office; Vargas was a bailiff and security guard at a county court; Buckley was a process server; and Denard was reported merely to be an employee in the sheriff's office. 427 U.S. at 350–51, 96 S.Ct. at 2678.

6. 509 F.2d 1133 (7th Cir. 1975).

7. Justices White and Marshall joined Justice Brennan in the plurality opinion; Justice Blackmun joined Justice Stewart in the concurring opinion. Mr. Justice Stevens did not participate; however, his views on the issues raised in the case at bar may be discerned from a pre-*Elrod* decision in which he wrote the panel's opinion. *See Illinois State Employees Union, Council 34 v. Lewis,* 473 F.2d 561 (7th Cir. 1972), *cert. denied,* 410 U.S. 928, 943, 93 S.Ct. 1364, 1370, 35 L.Ed.2d 590, 609 (1973). *See also* Part IV *infra.*

tal government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained . . . outweigh[s] the loss of constitutionally protected rights". 427 U.S. at 363, 96 S.Ct. at 2685 (footnote omitted). Three government interests were offered by petitioners in *Elrod* in justification of patronage dismissals: the need to insure effective government and the efficiency of public employees, the need for political loyalty of employees, and the preservation of the democratic process. On the facts presented, the *Elrod* Court rejected each interest as inadequate to justify infringement of respondents' first amendment rights of belief and association. 427 U.S. at 364–73, 96 S.Ct. at 2685–89. With regard to the need for political loyalty, however, Mr. Justice Brennan's plurality opinion did establish that patronage dismissals were constitutionally justified where limited to "policymaking positions".

A second interest advanced in support of patronage is the need for political loyalty of employees, not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate. The justification is not without force, but is nevertheless inadequate to validate patronage wholesale. Limiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end. Nonpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party.

No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals. Thus the political loyalty "justification is a matter of proof, or at least argument, directed at particular kinds of jobs." *Illinois State Employees Union v. Lewis,* 473 F.2d at 574. Since, as we have noted, it is the government's burden to demonstrate an overriding interest in order to validate an encroachment on protected interests, the burden of establishing this justification as to any particular respondent will rest on the petitioners on remand, cases of doubt being resolved in favor of the particular respondent.

427 U.S. at 367–68, 96 S.Ct. at 2687 (emphasis in original).

Mr. Justice Stewart declined to join in the plurality's consideration of the constitutional validity of the patronage system *generally.* Instead, he viewed the "single substantive question involved in [*Elrod* as being] whether a *nonpolicymaking, nonconfidential* government employee can be discharged from a job that he is satisfactorily performing upon the sole ground of his political beliefs". 427 U.S. at 374–75, 96 S.Ct. at 2690 (emphasis added, Stewart, J., concurring). The answer was that he cannot.

### B. *Progeny*

Courts and commentators have read Mr. Justice Stewart's narrow position as the Court's holding in *Elrod. See Ramey v. Harber,* 589 F.2d 753, 757 & nn. 2, 3 (4th Cir. 1978), *aff'g in part and rev'g in part,* 431 F.Supp. 657 (W.D.Va.1977), *cert. denied,* ── U.S. ──, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979); Comment, *Patronage And The First Amendment After Elrod v. Burns,* 78 Colum.L.Rev. 468, 473 n. 55 (1978). *See generally Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260

**1034**

(1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' "). Accordingly, most judicial interpretations of *Elrod* have found that a *policymaking, confidential* employee can be discharged from a job that he is satisfactorily performing upon the sole ground of his political beliefs. *See, e. g. Johnson v. Bergland,* 586 F.2d 993, 995 (4th Cir. 1978); *McCollum v. Stahl,* 579 F.2d 869, 872 (4th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1225, 59 L.Ed.2d 460 (1979); *Alfaro de Quevedo v. de Jesus Schuck,* 556 F.2d 591 (1st Cir. 1977); *Norbeck v. Davenport Community School District,* 545 F.2d 63, 67 (8th Cir. 1976), *cert. denied,* 431 U.S. 917, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977); *Besig v. Friend,* 460 F.Supp. 134, 139 (N.D. Cal.1978); *Finkel v. Branti,* 457 F.Supp. 1284, 1289 (S.D.N.Y.1978), *aff'd,* 598 F.2d 609 (2d Cir. 1979) *cert. granted,* U.S. ——, 99 S.Ct. 3095, 61 L.Ed.2d (1979); *Miller v. Board of Education,* 450 F.Supp. 106, 109 (S.D.W.Va.1978); *Tanner v. McCall,* 441 F.Supp. 503, 512 (M.D.Fla.1977).

Therefore, if appellant Stegmaier is properly classified as a policymaking, confidential employee, the district court was correct in finding that she was entitled to no relief.

## III. POLICYMAKERS

The district court found, as a matter of fact, that the position of Circuit Clerk was a policymaking position. Recognizing that the Deputy Circuit Clerk is vested with powers concurrent to the Circuit Clerk's, the district court then concluded that the office of Deputy Clerk was also a policymaking position.

 Our review of this factual finding[8] is limited by the clearly erroneous standard of Rule 52(a). Fed.R.Civ.P. 52(a). A finding is clearly erroneous when the reviewing court, although finding some evidence to support the finding, is left with the definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Mercer v. C. A. Roberts Co.,* 570 F.2d 1232, 1236 n. 5 (5th Cir. 1978). Where, as in the case sub judice, the case was submitted to the district judge solely upon the basis of the pleadings and affidavits, the burden of showing findings clearly erroneous is somewhat less than where the factual findings were based in part upon the credibility of witnesses. *Village Fair Shopping Center Co. v. Sam Broadhead Trust,* 588 F.2d 431, 434 n. 2 (5th Cir. 1979); *Volkswagen of America, Inc. v. Jahre,* 472 F.2d 557, 559 (5th Cir. 1973). In the light of these general principles we conclude that the district court was clearly erroneous in finding as a matter of fact that the position of Circuit Clerk is a policymaking position within the meaning ascribed to that term in *Elrod v. Burns*: applicable Alabama constitutional and statutory provisions[9] clearly reflect

**8.** In *Elrod* the Supreme Court plurality said that "the political loyalty 'justification is a matter of proof, or at least argument, directed at particular kinds of jobs.' " 427 U.S. at 368, 96 S.Ct. at 2687. Courts have uniformly interpreted this passage to mean that the question of whether an employee is a policymaker or falls within the policymaker, confidential employee exception to *Elrod* is a question of fact. *See Johnson v. Bergland,* 586 F.2d 993, 995 (4th Cir. 1978); *McCollum v. Stahl,* 579 F.2d 869, 873 (4th Cir. 1978), *cert. denied,* -- U.S. ——, 99 S.Ct. 1225, 59 L.Ed.2d 460 (1979); *Rosenthal v. Rizzo,* 555 F.2d 390, 393 & n. 3, 394 (3d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977); *Ramey v. Harber,* 431

F.Supp. 657, 665 (W.D.Va.1977), *aff'd in part and rev'd in part on other grounds,* 589 F.2d 753 (4th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979).

**9.** The district court's findings were based upon Ala.Code tit. 13, §§ 197, 198 (1958 & Supp. 1973) (*now codified at* Ala.Code tit. 12, §§ 12-17-93, 12-17-94 (1975)). Appellant moved for a new trial on the grounds, *inter alia,* that *neither the position of Circuit Clerk nor Deputy Circuit Clerk was a policymaking position* under sections 197 and 198 in light of the 1973 amendment to the Alabama Constitution. This motion was denied on February 15, 1977, subsequent to the January 16, 1977 effective date for the new provisions of Alabama Code Title

that policymaking decisions with regard to the operation of the Circuit Clerk's office in the Alabama unified judicial system are made by the Administrative Director of the Courts, not Circuit Clerks.

Under *Elrod v. Burns* the question of whether a particular public employee is a policymaker can be answered only by analyzing the nature of the employee's responsibilities. 427 U.S. at 367, 96 S.Ct. at 2687. "[T]itles alone do not provide the answer". Note, *Will the Victor Be Denied the Spoils? Constitutional Challenges to Patronage Dismissals*, 4 Hastings L.Q. 165, 182 (1977). *Elrod* also requires that in close cases doubt should be resolved in favor of the public employee subjected to patronage dismissal. 427 U.S. at 368, 96 S.Ct. at 2687. Unfortunately, *Elrod* does not provide any definition of "policymaking positions" other than intimating that policy makers have broad responsibilities with ill-defined objectives, and may act as advisers or formulate plans for the implementation of broad goals. 427 U.S. at 367–68, 96 S.Ct. at 2687. Policymakers also may be identified as public employees whose responsibilities require more than simple ministerial competence, whose decisions create or implement policy, and whose discretion in performing duties or in selecting duties to perform is not severely limited by statute, regulation, or policy determinations made by supervisors. *See Johnson v. Bergland*, 586 F.2d 993 (4th Cir. 1978); *Newcomb v. Brennan*, 558 F.2d 825 (7th Cir.), *cert. denied*, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977). A policymaker also may be an individual who "controls or exercises a role in a decision making process as to the goals and general operating procedures of [an] office". *Ramey v. Harber*, 431 F.Supp. 657, 666 n. 15 (W.D.Va. 1977), *aff'd in part & rev'd in part on other grounds*, 589 F.2d 753 (4th Cir. 1978), *cert. denied*, –– U.S. , 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979). The statutory duties

and authority of Circuit and Deputy Circuit Clerks under Alabama's unified judicial system do not fall within the scope of the term "policymaker" as that term has been defined above.

In 1973 Article VI of the Alabama Constitution was amended to provide for a "unified judicial system". Ala.Const. art. VI, § 6.01(a) (Amendment No. 328, ratified Dec. 27, 1973). Under this constitutional provision Circuit Clerks are elected by qualified voters in each county for six-year terms. *Id.* § 6.20(b). On October 9, 1975, the Alabama Legislature adopted a measure designed to implement the new judicial article of the Alabama Constitution. Act No. 1205, 1975 Ala.Acts (codified in scattered sections of Ala.Code tit. 12 (1975)). Under this act the administrative office of courts was created. Ala.Code tit. 12, § 12–5–1 (1975). The administrative office of the courts was given authority to "serve as an agency to apply for and receive grants or other assistance and to coordinate or conduct studies and projects in connection with the improvement of the administration of justice." *Id.* § 12–5–2(a).

Under Alabama's unified judicial system the state department charged with the duty of assisting the Chief Justice of the Supreme Court of Alabama in connection with his duties as chief administrative officer of the courts is the department of court management. *Id.* § 12–5–3(a). Among other duties, the department of court management is required to work with the clerks of all state courts to "collect, obtain, compile and digest information and statistics concerning the administration of justice in the state". *Id.* § 12–5–3(b)(1). "Unless the chief justice otherwise directs, the department of court management, *under the direction of the administrative director of courts*, shall have the responsibility for trial

---

12 Courts, which implemented the new Judicial Article of the Alabama Constitution. Ala. Const. art. VI (Amendment No. 328, ratified Dec. 27, 1973). Various sections of Title 12 define the duties of the Circuit and Deputy Circuit Clerk as they exist during appellee Trammell's elective term. We look, as the dis-

trict court presumably did in denying appellant's motion for a new trial, to these constitutional and statutory materials in determining whether a Circuit Clerk is a policymaking position within the Alabama unified judicial system.

court administration". *Id.* § 12–5–6 (emphasis added). *See also id.* § 12–5–8 (administrative director of courts ex officio head of department of court management and head of administrative office of courts).

Section 12–5–10 of the Alabama Code prescribes the duties and authorities of the administrative director of the courts. That section provides:

In addition to any other duties and responsibilities that may be assigned to the administrative director of courts by the chief justice, he shall have the following duties and authority with respect to all courts, subject to the direction of the chief justice:

(1) To require the filing of reports, the collection and compilation of statistical data and other information on the judicial and financial operation of the courts and on the operation of other offices directly related to and serving the courts;

(2) To determine the state of the dockets and evaluate the practices and procedures of the courts and make recommendations concerning the number of judges and other personnel required for the efficient administration of justice;

(3) To prescribe uniform administrative and business methods, systems, forms and records to be used in the offices of the clerks and registers of courts;

(4) To prepare and submit budget recommendations for state appropriations necessary for the maintenance and operation of the unified judicial system, with the exception of appellate courts, and to authorize expenditures from funds appropriated for these purposes as permitted or authorized by law;

(5) To investigate, make recommendations concerning and assist in the securing of adequate physical accommodations for the unified judicial system;

(6) To procure, distribute, exchange, transfer and assign such equipment, books, forms and supplies as are acquired with state funds or grant funds or otherwise for the unified judicial system;

(7) To make recommendations for the improvement of the operations of the unified judicial system;

(8) To prepare and submit an annual report on the work of the unified judicial system to the chief justice;

(9) To assist the chief justice in performing his duties relating to the transfer and assignment of justices and judges for temporary or specialized duty;

(10) To assist the judicial conference in its tasks;

(11) To promote, carry on and assist in programs designed to aid in the continuing education of justices, judges and other court personnel;

(12) To take necessary steps in the collection of unpaid court costs, fines and forfeitures;

(13) To serve as a liaison with the executive and legislative branches of the state government; and

(14) To perform such additional administrative duties as may be assigned by the chief justice.

Ala.Code tit. 12, § 12–5–10 (1975).

The administrative director of courts also is responsible for the direction of expenditure of funds for all courts, for all functions, directly or indirectly affecting the operation of any court. *Id.* § 12–5–13(b). He also is authorized to employ consultants for the purpose of conducting studies and projects pertaining to the administration of justice and improvement of courts in Alabama. *Id.* § 12–5–14. In connection with studies, projects and functions designed to improve or effect the administration of justice, section 12–5–18 is also relevant. That section provides:

In connection with studies, projects and functions designed to improve or effect the administration of justice, the operation of courts and continuing legal and judicial education, the administrative director of courts, the department of court management and the chief justice are authorized to *use the services of* any member of the judiciary of any court and court-supportive personnel, including, but not limited to, court reporters, *clerks*, registers, bailiffs, law clerks, court ad-

ministrators, secretaries and employees in clerks' offices and registers' offices.

*Id.* § 12–5–18 (emphasis added).

In contrast to the broad duties and responsibilities of the administrative director of the courts, the authority and duties of the office of Circuit Clerk are *specifically* delineated by statute. Although elected under the Alabama Constitution, Circuit Clerks are employed and paid by the State of Alabama. *Id.* § 12–17–80. The authority of the Circuit Clerk is found in section 12–17–93 which provides:

Clerks of the circuit court have authority:

(1) To administer oaths and take acknowledgments and affidavits in all cases in which the authority to administer such oath or take such affidavit is not confined to some other officer.

(2) *To appoint deputies, with full power to transact all business of such clerks, such deputies first taking an oath to support the Constitution and laws of this state and faithfully to discharge the duties of deputy clerks of the court for which they act.*

(3) To receive the amount of any judgment entered in the courts of which they are clerks, either before or after the issue of execution thereon.

(4) To exercise such other powers as are, or may be, conferred by law, including administrative rules of procedure promulgated by order of the supreme court of Alabama.

*Id.* § 12–17–93 (1975) (emphasis added).

The Circuit Clerk's duties are also specifically defined by statute:

(a) It is the duty of the clerks of the circuit court:

(1) To sign and issue all summons, subpoenas, writs, executions and other processes, under the authority of the court;

(2) To keep a consolidated docket sheet of civil and criminal cases, the names of the parties, the character of action or offense, the names of the attorneys and the sheriff's return, which must be entered in all civil and criminal cases standing for trial, in the order in which they are brought, and the bench notes, orders, rulings on motions and pleadings, other preliminary matters and final judgment which have been made in each case by the judge, which shall be the official minutes;

(3) To keep all papers, books, dockets and records belonging to their office with care and security, with the papers filed, arranged, numbered and labeled, so as to be of easy reference, and the books, dockets and records properly lettered; and to allow parties to inspect the records free of charge;

(4) To make out and deliver, on application and payment of the legal fees therefor, to any person applying for the same, a correct transcript, properly certified, of any paper or record in their offices; and

(5) To exercise such duties as are, or may be, conferred upon them by law, including administrative rules promulgated by order of the supreme court of Alabama.

(b) Any clerk of any circuit court who fails to perform any duty imposed on him, for the failure to perform which no other punishment is provided, shall, on conviction, be fined not exceeding $200.00.

*Id.* § 12–17–94 (1975). Other duties of Circuit Clerks include: certifying a copy of indictments against convicts sentenced to the penitentiary, *id.* § 12–17–96; paying money in his possession at the expiration of his term of office to his successor upon demand, *id.* § 12–17–97; preparing monthly reports on forms approved by the chief examiner of public accounts, showing the amount of fines, trial tax, district attorney fees and other fees that accrue to the benefit of the state, county or municipality that were collected the preceding month, *id.* § 12–1–19; notifying the parties or one of their attorneys of record of the date of a court-ordered special session of court, *id.* § 12–11–7; transferring a case to the docket of the appropriate court when filed in a court lacking jurisdiction, *id.* § 12–11–9; accepting payment from parents legally obligated to support a child after a judicial

determination that such support is required under state law, id. § 12–15–11; retaining charges moved for by a party which the trial judge refuses to give, *id.* § 12–16–13; issuing jury venires, *id.* § 12–16–74; filing and retaining books and lists prepared by grand jury foremen, *id.* § 12–16–199; serving as ex officio clerk of the district court and having administrative responsibility for and supervision of records and clerical services of the district courts, id. § 12–17–160.

■ Circuit Clerks, therefore, have *no authority* to make policy decisions with regard to: compilation of data and statistics; prescription of administrative and business methods, systems, forms, and records used in the Clerk's office; preparation of budgetary recommendations; investigation and recommendation regarding physical facilities; and procurement, distribution, and assignment of equipment, books, forms, and supplies. This authority is expressly vested in the administrative director of the courts. Ala.Code tit. 12, § 12–5–10 (1975). The only role the Circuit Clerk plays in the broad scheme of policy determination is ministerial—the clerk's "services" are available to the administrative director of the courts. *Id.* § 12–5–18.

■ The district court was clearly erroneous in finding that the Circuit Clerk occupies a policymaking position. Consequently, even though the Deputy Circuit Clerk has authority concurrent to the Circuit Clerk's, the deputy cannot be deemed a policymaker. This conclusion, however, does not require reversal of the judgment entered below: it is firmly established that an appellate court must affirm the lower court's judgment if the result is correct even though it is based upon an improper ground. *SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *Eltra Corp. v. Ringer,* 579 F.2d 294, 298 & n. 12 (4th Cir. 1978); *Lum Wan v. Esperdy,* 321 F.2d 123, 125 (2d Cir. 1963); *cf. Raven v. Panama Canal Co.,* 583 F.2d 169, 171 (5th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1787, 60 L.Ed.2d 240 (1979) (successful party in the district court may sustain its judgment on any ground that finds support in the record).

We must decide, therefore, whether the district court's judgment must be affirmed because appellant Stegmaier occupied a position of confidence, loyalty, and trust. This requires consideration of two questions: (1) whether there is a "confidential employee" exception to *Elrod v. Burns* in addition to the "policymaking employee" exception; and (2) if there is such an exception, whether appellant Stegmaier falls within its scope even though the elected official with whom she would have to "enjoy" a relationship of confidence, loyalty, and trust is not a policymaking public official.

### IV. CONFIDENTIAL EMPLOYEES

A question raised by the concurring opinion in *Elrod* is whether the language "non-policymaking, nonconfidential" established two classes of public employees subject to patronage dismissals. One commentary and analysis of *Elrod* has suggested that the concurring opinion created two exceptions to the Court's general proscription of patronage dismissals, permitting patronage dismissals of confidential employees as well as public employees in policymaking positions. *The Supreme Court, 1975 Term,* 90 Harv.L.Rev. 186, 193–94 (1976).

[T]he policymaking and confidential employee *exceptions* . . . are justified by state interests sufficient to outweigh the accompanying burdens on first amendment rights. Elected officials must be able to assemble their own loyal staffs of advisors and administrators to assist them in formulating and implementing the policies necessary to carry out their electoral mandates. . . . *Certainly elected officials should be permitted to dismiss their predecessor's personal secretaries and a few others who work closely with such officials in positions requiring a relationship of mutual trust.* However, courts should construe the exception narrowly and guard against efforts to invoke it in support of across-the-board patronage dismissals.

*Id.* at 194 & n. 41 (emphasis added).

Another commentator has suggested that a confidential employee might be deemed a policymaker within the meaning of *Elrod,*

confidentiality being one criterion "thrusting a governmental position to the policymaking end of the scale". Comment, *Patronage Dismissals and Compelling State Interests: Can the Policymaking/Nonpolicymaking Distinction Withstand Strict Scrutiny,* 1978 Southern Ill.Univ.L.J. 278, 285. On the other hand, this same commentator has also observed that a confidential employee, under the rationale of the *Elrod* plurality and the language of the concurrence, could be a second class of public employees subject to patronage dismissals:

> Surely the rationale underlying the policymaking employee justification of patronage dismissals is equally applicable to one who, although not in a position to formulate or implement policies, occupies a position with such access to confidential information that he could covertly restrict the implementation of the policies of the newly elected official. On the other hand, it can be argued that an alternative available would be dismissal for cause when such covert actions occur. However, this alternative may not be as effective as dismissal of a confidential employee because of political incompatability [sic] with his elected superiors; to await discovery of covert action may prove devastating to policy implementation by the new administration. If a standard is to be established it would seem that one in a confidential position should be no less subject to patronage dismissal than one in a policymaking position: in either case dismissal may be deemed necessary to insure "that representative government not be undercut by tactics obstructing the implementation of policies of the new administration."

*Id.* at 285–86 (footnote omitted).

The existence of a confidential employee exception is further buttressed by the *Elrod* plurality opinion's repeated citation of a decision of the Court of Appeals for the Seventh Circuit written by then Circuit Judge Stevens, who did not participate in *Elrod* although a member of the Supreme Court. *Illinois State Employees Union, Council 34 v. Lewis,* 473 F.2d 561 (7th Cir. 1972), *cert. denied,* 410 U.S. 928, 943, 93

S.Ct. 1364, 1370, 35 L.Ed.2d 590, 609 (1973). In *Lewis* Justice Stevens, then Circuit Judge Stevens, stated that the question before the court was whether a nonpolicymaking employee may be discharged for refusing to transfer his political allegiance from one political party to another. In reversing the district court's entry of summary judgment, erroneously predicated on rejection of the non-movant's version of the facts, then Circuit Judge Stevens said:

> Plaintiffs properly do not challenge the public executive's right to use political philosophy or affiliation as one criterion in the selection of policy-making officials. Moreover, *considerations of personal loyalty, or other factors besides determination of policy, may justify the employment of political associates in certain positions.* It is difficult to believe, however that any such justification would be valid for positions such as janitors, elevator operators or school teachers.

473 F.2d at 574 (emphasis added).

One post-*Elrod* decision has found that the *Elrod* concurrence requires that public employees be nonconfidential employees, as well as nonpolicymakers, before they can maintain an action for patronage dismissal. *Finkel v. Branti,* 457 F.Supp. 1284 (S.D.N.Y. 1978), *aff'd,* 598 F.2d 609 (2d Cir. 1979) *cert. granted,* ·· U.S. , 99 S.Ct. 3095, 61 L.Ed.2d ·· (1979). In *Finkel* plaintiffs, assistant public defenders, had been appointed to their positions by a Republican Public Defender, also an appointee. Their employment was to be terminated when a Democratic Public Defender was appointed. Plaintiffs alleged that they were nonpolicymaking, nonconfidential employees who were satisfactorily performing their duties; therefore, attempting to replace them on political grounds violated the First and Fourteenth Amendments. The *Finkel* court enjoined the termination or attempted termination of the plaintiffs' employment upon the sole ground of their political beliefs, holding, *inter alia,* that plaintiffs were neither policymakers nor confidential employees. In attaining this result, the *Finkel* court said;

In *Elrod* and its progeny, the requirements of "nonpolicymaking" and "nonconfidentiality" are discussed in a manner that makes clear that the concepts are related to one another. More specifically, the discussion in the cases suggests that the concept of confidentiality is ancillary to the concept of policymaking. *An employee is a "confidential employee" if he or she stands in a confidential relationship to the policymaking process, e. g., as an advisor to a policymaker, or if he or she has access to confidential documents or other materials that embody policymaking deliberations and determinations, e. g., as a private secretary to a policymaker.*

457 F.Supp. at 1291 (emphasis added). Finding that plaintiffs were nonconfidential employees, the *Finkel* court emphasized that any confidential relationship between plaintiffs and the Public Defender was in the latter's capacity as a supervisor, *not* in his role as decisionmaker about the orientation and operation of the public defender's office (*i. e.* a policymaking role).

 While agreeing, in general, with the *Finkel* court and the commentaries discussed above that a confidential employee may constitutionally be discharged solely upon the basis of political affiliation when he stands in a confidential relationship to a policymaker or the policymaking process, we hold that appellant Stegmaier falls within the confidential employee exception even though the position of Deputy Circuit Clerk does not stand in a confidential relationship to a policymaker or a policymaking process.

 Where a state, through its constitution, has decided to make certain public offices elective, it has also chosen to vest the electorate with the power to select one candidate over another for any reason. In the case of a Circuit Clerk under the Alabama unified judicial system, it is clear that a candidate for the office of Circuit Clerk can have no "policy platform" on which to seek office since policy decisions as to the operation of his office, the administration of justice, practice and procedure in the circuit courts, and the expenditure of funds are beyond his duty and authority. The public, however, does have the right under the Alabama Constitution to elect its Circuit Clerks and, presumably, attempts to elect capable and honest individuals when doing so. If there is any policy "presumably sanctioned by the electorate", *Elrod v. Burns, supra,* 427 U.S. at 367, 96 S.Ct. at 2687, in its election of one individual as Circuit Clerk over another, it is that of honesty and integrity. This presumption is especially strong where the nature of the Circuit Clerk's position involves the handling of private and public litigant's fees and judgments. *See generally* Ala.Code tit. 12, §§ 12–17–93, 12–17–94 (1975); note 3 *supra.* When, by statute, a deputy clerk is empowered to conduct all business which the clerk is authorized to conduct, Ala.Code tit. 12, §§ 12–17–93(2) (1975), and when, by statute, the clerk is subject to civil liability and fines for failure to perform his statutory duties, *id.* § 12–17–94(b), the Circuit Clerk must be afforded the opportunity to select his single deputy clerk; he must be able to select a deputy in whom he has total trust and confidence and from whom he can expect, without question, undivided loyalty. Of course these general remarks in no way reflect any judgment on appellant Stegmaier's competence, honesty or integrity; they serve simply to justify why Circuit Clerk Trammell was justified in selecting a Deputy Clerk of his own choice.

We conclude, therefore, that appellant Stegmaier falls within the confidential employee exception to *Elrod v. Burns, supra,* notwithstanding the fact that appellee Trammell, as Circuit Clerk, *does not occupy a policymaking position.*

The judgment entered by the district court below is therefore

AFFIRMED.