**Edgardo A. GONZALEZ, Jr., Plaintiff-Appellee Cross-Appellant,**

v.

**C.Y. BENAVIDES, Jr., et al., Defendants-Appellants Cross-Appellees.**

No. 81–2389.

United States Court of Appeals,
Fifth Circuit.

Aug. 15, 1983.

Oscar J. Pena, Lawrence A. Mann, Laredo, Tex., for defendants-appellants cross-appellees.

Luis Segura, San Antonio, Tex., Oscar M. Laurel, Jr., Laredo, Tex., for plaintiff-appellee cross-appellant.

Before RANDALL and HIGGINBOTHAM, Circuit Judges, and BUCHMEYER *, District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The executive director of a community action agency publicly denied that the county commissioners court had supervisory authority over his and his assistant's job performance. On his refusal to publicly retract the statement, the commissioners fired him. The commissioners appeal from a money judgment payable by the county entered after a bench trial upon a finding that the firing contravened the First Amendment. Finding that the trial court did not consider a governmental interest arguably present, we remand to allow the trial court to determine if such an interest was in fact presented and to weigh any found interest against the asserted speech laid in the context of the time, place, and manner of its making.

After eleven years as an employee of the Laredo-Webb County Community Action

* District Judge of Northern District of Texas, sitting by designation.

Agency, Edgardo A. Gonzalez, Jr. confronted the Commissioners of Webb County on May 12, 1980, and was fired. He had then been Executive Director of the agency for approximately fourteen months.

Gonzalez sued the commissioners asserting claims under 42 U.S.C. § 1983. After a bench trial, the district court rejected Gonzalez's claim that he had a protected property interest in his job or that the circumstances surrounding his discharge were such as to trigger liberty interests. The trial court further found, however, that Gonzalez was fired for conduct protected by the First Amendment and, accordingly, awarded damages and attorneys' fees. The commissioners here argue that Gonzalez's "conduct" did not enjoy First Amendment protection, that any protected interest was outweighed by the statements, and that regardless, his speech was not a substantial factor in Gonzalez's termination.

Under the Community Action Agency concept, the Webb County Commissioners Court was the governing board of the agency and had the exclusive right to hire and fire its executive director. While the Commissioners Court maintained general governance by its control over the executive director, the immediate affairs of the agency were delegated to a twenty-one-person board functionally termed "the Administering Board." The terminal confrontation had its beginning on May 9, 1980, when Gonzalez decided to fire his Deputy Director, Oscar Chavez. Before doing so, Gonzalez spoke privately with at least two of the commissioners, one of whom told him he should proceed with what he thought was right, while the other cautioned that the Commissioners Court probably would not agree.

The latter advice proved to be accurate. When Gonzalez fired Chavez, the Commissioners Court immediately added that subject to its agenda for its scheduled meeting of May 12. Following an executive session of the Commissioners Court on May 12, the court issued a public statement explaining the commissioners' view that Gonzalez lacked the authority to fire Chavez and

reprimanded him for having attempted to do so. That statement also advised that Commissioner Morales was to investigate the incident. The public reprimand of Gonzalez was disseminated throughout the local media. The posted notice for the Commissioners Court meeting scheduled for June 16, 1980, included "discussion on Executive Director and Deputy Director's job performances C.A.A."

After some starting and stopping, the Commissioners Court finally convened on June 23 to consider the performance of Gonzalez and Chavez. Thereafter, in an executive session which for the most part proceeded without the attendance of Gonzalez or his attorney, the commissioners heard from twenty-six witnesses regarding the operation of the Community Action office. Despite its length, that session had no bearing on the decision to fire Gonzalez. It was at the conclusion of this executive session that Gonzalez and his attorney met with the Commissioners Court and the confrontation occurred. A transcript of the entire executive session's proceedings was received in evidence, but the colloquy among the commissioners, Gonzalez, and his attorney was often in the shorthand of conversation and occasionally less than articulate. Read in context and aided by the trial testimony, it is clear, as found by the trial court, that the dispute included a disagreement over whether it was the Administering Board or the Commissioners Court that had the legal right to evaluate the job performance of Gonzalez. Based on the transcript and the testimony at trial the trial court found:

> After further discussion, Commissioner Morales summarized by describing what he perceived to be "an irreconcilable difference" between Gonzalez and the Court. He repeated the position of the Commissioners Court that they had the absolute right to hire and fire the Executive Director. He specifically asked Gonzalez whether, regardless of his personal beliefs, he would publicly recognize that authority on the part of the Commissioners Court. At this point, the Commissioners took a recess of twenty to thirty

minutes to enable Gonzalez to confer with his attorney and determine his response to the request. After the recess, Gonzalez' attorney then announced the decision that Gonzalez felt he was being asked to agree with something that he considered to be a violation of policies and procedures and that he refused to do so. The Commissioners then went into public session and voted to fire Gonzalez.

The trial court first found that no statement of Gonzalez constituted a personal attack on any member of the Commissioners Court and further found that "it cannot be said that Gonzalez's statements were false, much less malicious." It also found that the dispute was a matter of legitimate public concern because it involved a discussion of the power of the County Commissioners and the Administering Board over distribution by the Community Action Agency of millions of dollars in the community. In addition, the court concluded that the day-to-day working relationship between Gonzalez and the Commissioners Court was not of such a personal and intimate nature that Gonzalez's statements regarding the relative authority of the Board and the commissioners would undermine the effectiveness of their relationship. The court noted that there was no evidence that Gonzalez disobeyed or violated any order of the commissioners; instead, he "merely expressed the opinion that certain conduct by the commissioners was contrary to proper procedures and was fired for failing to retract that statement." The court then explicitly found what it had already implicitly concluded, that Gonzalez's exercise of his First Amendment rights was a substantial and motivating factor in the decision by the commissioners to fire him. Indeed, it was stipulated at trial that Gonzalez was fired because he denied that the commissioners were his superiors.

But these findings of fact only set the factual stage for a difficult legal play. In concluding this prologue we note the standard of review recently noted in *Connick v. Myers*, —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983):

The Constitution has imposed upon this Court final authority to determine the meaning and application of those words of that instrument which require interpretation to resolve judicial issues. With that responsibility, we are compelled to examine for ourselves the statements in issue and the circumstances under which they are made to see whether or not they ... are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.

*Id.* at —— n. 10, 103 S.Ct. at 1692 n. 10 (*quoting Pennekamp v. Florida,* 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946) (footnote omitted)). Reading this instruction with our usual standard for reviewing facts, we conclude that our independent constitutional judgment is to be made upon the facts sustained by our clearly erroneous rule. If, for example, the trial court resolves a genuine dispute as to whether statement A rather than B was made, our review of any First Amendment question will accept the statement found by the trial court to have been made.

The commissioners rely heavily upon what has come to be termed a *Pickering* defense. That defense is derived from *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), as explicated by *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), and *Connick v. Myers,* 461 U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708.

In *Pickering,* a school board terminated a teacher for sending a letter to a local newspaper criticizing the board's allocation of school funds between athletics and education and its methods of informing taxpayers about the need for additional revenue. The Illinois Supreme Court had rejected Pickering's First Amendment claims because it concluded that the school board's findings that the publication of the letter was "de-

trimental to the best interest of the school" were supported by substantial evidence. The Supreme Court found Pickering's termination violated his First Amendment rights. It emphasized that the relationship between the teacher and the school board was not so intimate as to be impaired by the letter. It also noted that an accusation in the letter regarding money spent on athletics only reflected "a difference of opinion between Pickering and the Board as to the preferable method of operating the school system, a difference of opinion that clearly concerns an issue of general public interest." 391 U.S. at 571, 88 S.Ct. at 1736. Finally, it also noted that the matter was one of "legitimate public concern" about which "debate is vital to informed decision-making by the electorate." Id. at 571–72, 88 S.Ct. at 1736. The Court concluded that in the absence of proof of false statements knowingly or recklessly made, "a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his termination from public employment." Id. at 574, 88 S.Ct. at 1738.

In Givhan, the Court used the Pickering balance as the construct for review of private expressions of public employees and found that these expressions were entitled to protection similar to that of public expressions. Thus, the Pickering line socratically accommodated four concerns: first, whether the working relationship between the employer and the employee was of such a personal and intimate nature that any public criticism would seriously undermine the effectiveness of the working relationship; second, whether the statements were true, false or made with reckless disregard for the truth; third, whether the statements undermined the general effectiveness

of the work group; and fourth, whether the statements were only critical of policy.[1]

The trial court weighed each of these concerns in its opinion. From the record it appears that Gonzalez's statement regarding the operation of the Community Action Agency involved a matter of public concern. Moreover, the relationship between the Commissioners Court and Gonzalez was not of a personal and intimate nature in the sense that they worked closely together on a daily basis. It was, instead, more closely analogous to that of school principal versus board. So defined, denying the authority of the county commissioners to superintend his work under the sanction of dismissal undermined no intimate relationship. There was no evidence that Gonzalez declined to follow any specific commissioners' directive or otherwise to discharge his duties. At the same time, denying the core authority of the commissioners to fire him was hardly supportive of their relationship. To the contrary, it plainly kept taut the tension drawn from an unsettled question of where local power and authority lay in the administration of this program in Webb County. In this sense, the working relationship between Gonzalez and the commissioners was "undermined." Under the Pickering balance, however, as the relationship expressed in terms of working environment between the employer and the targeted superior becomes increasingly remote and correspondingly less "intimate," the First Amendment rights shared in common with the citizenry return to the worker. If closeness of working environment and frequency of contact be the index, it would follow that because Gonzalez's denial touched upon a matter of public concern but did not undermine an intimate working relationship, the traditional Pickering bal-

---

1. This court has consistently treated intimacy of working relationship as the fulcrum of the Pickering balance. At the same time we have described the result of this balancing exercise not in terms of "outweighed" statements but in terms of "unprotected" statements. See, e.g., Bowen v. Watkins, 669 F.2d 979, 986 n. 11 (5th Cir.1982). The Bowen panel noted its agreement "with the Hoopes court's view [Hoopes v. Nacrelli, 512 F.Supp. 363 (E.D.Pa.1981)] that

statements injurious to close working relationships may be unprotected." Id. Whatever may be the importance in other contexts of describing speech as unprotected rather than outweighed, the Bowen panel was weighing and not categorizing, at least not in Chaplinsky terms. See Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) ("fighting words" are unprotected).

ance would suggest that his firing contravened the First Amendment.

■ Nevertheless, nothing in the *Pickering* line suggests the irrelevance of other governmental concerns in different fact situations. Indeed, the common conceptual strand to much of our First Amendment jurisprudence is context—time, place, and manner. Implicit in this emphasis is that jealous protection of speech rights abjures mechanical response. The most recent *Pickering* offspring from the Supreme Court accents the Court's effort to avoid formulaic response. In *Connick v. Myers,* 461 U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708, the Court held by a five-to-four vote that the First Amendment did not prevent the New Orleans District Attorney from terminating an Assistant District Attorney who had circulated a questionnaire among the office staff. The questionnaire asked whether the employees felt transfers were fair, whether they had confidence in certain other employees, and whether they felt "pressured to work in political campaigns on behalf of office supported candidates." Characterizing most of Myers' questionnaire as involving matters only of "personal interest" rather than matters of "public concern," the Court held that "it is unnecessary for us to scrutinize the reasons for discharge." *Id.* at ——, 103 S.Ct. at 1689. Although the Court did find that the question regarding coerced participation in political campaigns touched upon a matter of public concern, it held that "[t]he limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Id.* at ——, 103 S.Ct. at 1694. *Connick's* relevant contribution to *Pickering* is essentially incremental. First Amendment issues presented by speaking employees are not answerable by mechanical formulae; courts must engage in a weighing exercise, giving "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Id.* at ——, 103 S.Ct. at 1692.

While the district court's balancing exercise was carefully undertaken, it was not in our view fully responsive to the governmental interests. None of the *Pickering* cases address the discharge of a person who functioned as the chief executive officer and expediter of policy and who was terminable at the will of his elected employer. Expressed another way we do not read the *Pickering* requirement of an intimate relationship to describe the exclusive category of possible government interests inhering in employer-employee relationships that can be weighed. While driven by concededly distinct concerns, the Court's struggle with political affiliation is here instructive because that effort identifies other governmental interests properly weighable that spring from relationships wholly without intimacy defined in terms of closeness of working environment.

In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court found that the First Amendment protected employees from discharge because of their political affiliation but excluded from this protection holders of certain "policy-level" positions. While the *Branti* Court eschewed this categorical inquiry, it continued to acknowledge that political affiliation may be a sufficient proxy of necessary loyalty as to be permissibly considered for certain types of "positions." Allowing political affiliation as a qualification for holding such sensitive positions represented a practical concession to the role of political parties with their disciplinary power of patronage in our government as well as to the necessity of leaving elected officials sufficient tools to carry out the policies of the offices to which they were elected.

■ One could argue that protection of direct expression regarding matters of public interest includes absolute job security even for holders of uniquely responsible positions. The argument would be that because such persons are likely to be the best informed on matters of public interest, the "purity" of their speech warrants sufficient

weight to override any governmental interests in avoiding frustration of an elected official's implementation of policy. The problem with this reasoning is both intuitively and conceptually obvious. The constitutional overlay of executive power aside, reasoning that permits the President to terminate a Deputy Secretary of Defense because he is a member of the opposition party but prohibits him from firing the Deputy for a public expression of policy contrary to his own suffers for lack of defining principle. Of course, the speech of such persons might not disrupt any intimate daily working relationship, but that is not the governmental interest being weighed. Government has an interest in conceding to elected officials the power to implement policy for which they must answer to the voters. In more familiar language, knowing that the buck stops, and where, is a substantial governmental interest. To put the issue argumentatively, the First Amendment surely does not require elected officials to sit silently by while their appointed chief executive publicly disavows the officials' authority over him. It is no answer to suggest that the elected officials also can turn to the idea marketplace to allow their view to compete with the policymaker they appointed. That answer skews the responsibility of the elected officials to the voters. Tolerance of such frosted relationships can deny the elected officials' authority to do their job.

In summary, blind insistence upon the presence of an intimate working relationship gives to *Pickering* precisely that rigidity and formulaic structure that the Court so recently denied in *Connick*. It mistakenly interpolates from the description of the weighing of the interests in the factual contexts of *Pickering* and progeny a rule excluding other governmental interests. Protection of an intimate working relationship expressed in terms of closeness of daily work environment is not the putative governmental interest here. There was no such relationship and so the traditional *Pickering* case ends. There is a governmental interest in securing those unique relationships between certain high level executives and the elected officials at whose grace they serve. For this narrow band of relationships, refusing to grant First Amendment found tenure would seem to take away little freedom not already lost in accepting the appointment itself, at least when the appointive job has the sweep of authority and discretion as to be central to the elected official's duty. The holder of such a position can hardly have any reasonable expectation but that his policy choices must publicly fall within the protective license issued by his appointing officer. His selection presumably included that supposition. To say that loss of that job is the price for his public declaration chills little. For us it follows that disruption of the relationship between an appointing authority and a holder of such a senior position may be weighed in the assaying of his First Amendment right to escape termination for a public disavowal of his appointing authority's power of supervision. But we say no more than that such governmental interests are relevant to the First Amendment inquiry into the context of time, place, and manner.

In terms of this case the ultimate question is whether that interest was present here and was such that Gonzalez's First Amendment protection did not include job security as executive director of the Community Action Agency. We turn then to the nature of Gonzalez's position as executive director, its relationship to the elected county commissioners, and the nature of the speech assertedly penalized to see if such an interest is arguably implicated here. In attempting to identify the kind of relationship we here protect we find the *Elrod-Branti* analysis helpful.

In *Elrod*, the Court described the characteristics of a policymaking employee:

> No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibil-

ities is critical. Employee supervisors, for example, may have responsibilities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well defined or are of a broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.

427 U.S. at 367–68, 96 S.Ct. at 2687. Later decisions add dimension. In *Newcomb v. Brennan,* 558 F.2d 825 (7th Cir.1977), *cert. denied,* 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977), the Seventh Circuit held that Milwaukee's deputy city attorney was a policymaker because he "functions in a highly discretionary role. He cannot perform his job by the simple exercise of ministerial competence. Rather, many of the decisions that he makes will involve implementation of the policies of the city attorney's office as a whole. Some of these decisions will actually create policy." *Id.* at 830. *See also Mummau v. Ranck,* 687 F.2d 9, 10 (3d Cir.1982) (holding that assistant district attorney fell within *Elrod-Branti* exception). More recently, this court held in *Stegmaier v. Trammell,* 597 F.2d 1027 (5th Cir.1979), that a deputy circuit clerk of an Alabama state court was not employed in a policymaking position. We noted there that circuit clerks had no statutory authority to make policy decisions regarding compilation of data, prescription of business methods, preparation of budget recommendations, investigation of physical facilities, and distribution of supplies; this authority was vested in the administrative director of the courts. In contrast to the broad duties of the administrative director, the duties of the circuit clerk were specifically defined by statute and were limited to relatively ministerial tasks. *Id.* at 1034–38.

From our reading of the record the following facts might have been found. The Laredo-Webb County Community Action Agency was funded with approximately $2.5 million to be distributed to people in the county who were poor, unemployed, ill, handicapped, or otherwise disadvantaged. The elected Commissioners Court had the ultimate responsibility for enforcing compliance with all grant conditions, approving all program plans, priorities, and budgets, and ratifying all actions of the Administering Board. This Administering Board was composed in part of elected officials (two of whom were commissioners), representatives of the poor, and business and civic leaders. Under the governance of the commissioners these twenty-one members were the immediate "board" of the CAA and were the first line of review for staff decisions regarding the solicitation and distribution of funds among some thirty programs. These programs ranged from "family planning" to "elderly feeding" to "storm disaster."

It appears that Gonzalez was the chief executive officer in this organizational scheme. According to a handbook of the Webb County Commissioners Court, the Executive Director had the day-to-day responsibility of implementing the policies and decisions subject to the ·Administering Board and, presumably, ultimately to the commissioners. He was required to keep the Administering Board informed about problems, progress, and status of the CAA's activities and to offer opinions and recommendations to guide the Board. In addition, he had the responsibility of hiring, supervising, training, and evaluating most CAA employees. He was the central figure in allocating money and personnel. If this be true there is little question but that he could make or break the program. Unlike the circuit clerk in *Stegmaier, supra,* Gonzalez as Executive Director had broad, discretionary responsibilities with loosely defined objectives. While the first line of responsibility for policy resided with the Administering Board and ultimately rested with the Commissioners Court, the Executive Director was entrusted to provide guidance and to choose a staff that would shape and give content to the programs. This power arguably afforded him the opportunity to thwart or to forward the goals of the elected commissioners. These elected commis-

**150**

sioners were answerable to the voters of Webb County for CAA programs.

We conclude then that this record presents a possibility that the relationship between the commissioners and Gonzalez fell into that narrow band of fragile relationships requiring for job security loyalty at the expense of unfettered speech. We find only that the record presents that issue. We do not suggest that our description is necessarily the one that will be found, only that when the inquiry is made there is evidence to support such a description. The trial judge has not evaluated the evidence with this governmental interest in protecting such relationships and we decline to do so for the first time on appeal. Instead we are persuaded that we must remand to allow the district court to make these decisions in the first instance.

On remand the trial court is free to take additional evidence. It should first decide from the facts whether in Gonzalez's relationship with the county commissioners his true position and power were such as to implicate the governmental interest we describe. If such an interest is implicated the trial court should then weigh that interest against the asserted rights of free speech. That weighing is required because we do not decide that all speech by persons in such relationships is unprotected. Rather, the speech must be weighed against its impact upon the relationship and that relationship's role in the elected official's discharge of his duties.

In this weighing one must look at what was said. We are wary of reviewing content in an *a priori* inquiry into entitlement to protection but that does not mean that content is irrelevant to the balancing exercise. In *Connick* the Court analyzed the nature of the asserted speech in determining its relevance to public issues. We require that here. The able trial judge has approached this case in a sensitive and thoughtful manner. We are reluctant to ask him to continue that effort, but we must do so.

REMANDED.