**Dr. Nolan L. KINSEY, Plaintiff–Appellant,**

v.

**SALADO INDEPENDENT SCHOOL DISTRICT, et al., Defendants–Appellees.**

No. 89–1717.

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1992.

Lynn Wade Malone, Charles M. Mc-Donald, McDonald, Harmon & Malone, Waco, Tex., for plaintiff-appellant.

William C. Bednar, Jr., Eskew, Muir & Bednar, Austin, Tex., for defendants-appellees.

Before CLARK, Chief Judge, GOLDBERG, POLITZ, KING, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.*

* Judge Harold R. DeMoss, Jr. was sworn in after this case was argued to the en banc court and elected not to participate in this decision.

BARKSDALE, Circuit Judge.

We took this case en banc to consider the protection *vel non* afforded by the First Amendment (as incorporated by the Fourteenth) to a public school superintendent, Dr. Nolan L. Kinsey, who opposed through speech and affiliation the winning slate in a school board election and was relieved of his duties (but with full compensation) by the new Board. Kinsey sued the Salado Independent School District and others (the School District), including asserting claims for violations of due process under the Fourteenth Amendment and freedom of speech (including of association) under the First. Summary judgment was granted against the former; judgment notwithstanding the verdict, against the latter. A divided panel reversed on the First Amendment issue. 916 F.2d 273.[1] We reach a different conclusion and AFFIRM.

## I.

Salado, Texas, is a small community. In 1988, there was considerable concern about the operation of its schools. Kinsey had served as superintendent since 1981, pursuant to a contract reviewed annually and extended periodically. In May 1988, elections were held for three positions on the seven member school board. Two groups sought board control, and the concern primarily centered on Kinsey. Controversy surrounding him had begun in 1984. The factors fueling it in 1988 included a new grading system, teacher certification (including teaching outside qualified area), and the division of authority between the Board and superintendent.

In January 1988, a few months before the elections, Kinsey's contract had been extended for a two-year term (through June 1990), but only by a vote of four to three. Well in advance of the elections,

Kinsey had become aligned with the four-member Board majority, including its president, Don Berry. Berry and two others from the majority were up for re-election and ran as a slate (Berry's). One of the members of the Board minority—Glen Hagler, who had shortly before voted against renewing Kinsey's contract—and two others (Hagler's) ran against Berry's. As noted, one issue concerned the Board's role: Kinsey's view was that the Board established policy, but he was to run the schools on a daily basis.

Berry's supported Kinsey's superintendency; Hagler's opposed it. Likewise, Kinsey openly expressed support for Berry's and opposition to Hagler's. Kinsey supported Berry's, because Berry shared a similar view of the Board's role. Kinsey was concerned that Hagler's would become involved in the daily operation of the schools. In addition, he was concerned that if Hagler's were elected, his job would be in jeopardy; this was one of the reasons why he was active in the campaign. Kinsey did not make any financial contributions, serve on any committees, or make any speeches. He did, however, have numerous conversations with Salado citizens in which he voiced support for Berry's and concerns about Hagler's.[2] In addition, as part of his political support for the Berry slate, he had a letter published in the local newspaper, in which he complimented Berry on his performance on the Board.

Essentially, a vote for Berry's was viewed as a vote for Kinsey; a vote for Hagler's, as a vote against him. Following one of the largest ever voter turnouts for such elections, Hagler's won by a wide margin and formed a new majority with Board member Joe Barrentine, who had not been up for re-election. As a member of the prior Board, he, like Hagler, had voted

---

1. It did not reach the due process claim. (Kinsey had requested that it be addressed only if the judgment on the First Amendment claim was not reversed.) Because we took this case en banc, and did not provide otherwise, the panel opinion is vacated. 5th Cir.Loc.R. 41.3 and our Internal Operating Procedure for Fed. R.App.P. 35.

2. On cross-examination, Kinsey testified that he had been "against [the Hagler slate's] election." When asked how he had been "openly against it", he replied: "Anybody that asked me what my opinion of ... the election was, who was running, who I felt like should be on the Board, I voiced my concerns." He "had quite a number of [these] conversations" with Salado residents.

in January 1988 against renewing Kinsey's contract. Barrentine and Hagler became the new Board president and secretary, respectively.

Simply put, immediately after the election, the situation went from bad to worse. There was a strained relationship between Kinsey and the new Board, to put it mildly.[3] It began meeting frequently in executive session about Kinsey. Lawyers were brought in on both sides. In late July 1988, after an unsuccessful attempt to buy-out Kinsey's contract, the Board agreed to set aside for six months the issue of his contract—until the usual January evaluation. For the interim, the Board issued directives regarding the manner in which he was to perform. There was disagreement regarding Kinsey's compliance with them. The Board majority felt that he rejected the directives; the minority, that he made reasonable efforts to comply.

Following issuance of the directives, the Board met with the Texas Education Agency to discuss its July 1988 evaluation of the district. That evaluation had lowered the accreditation rating, including because of the poor relationship between the Board and Kinsey (governance problem) and issues related to teacher certification (including misassigned teachers). Following that meeting, during which the Agency Administrator instructed the Board to solve the "governance problem", the Board scheduled a special session to discuss the termination or suspension of Kinsey's contract. In September 1988, the Board, by a vote of four to three, relieved him of his duties, but with full pay and benefits.

Kinsey promptly sued, including pursuant to 42 U.S.C. § 1983.[4] The complaint leaves no doubt about Kinsey's open opposition to, including association against, the new majority. It alleged that not later than April 1988, the Board had been "divid-ed into two political factions", with Kinsey associated with, and supported by, the majority (including Berry) and with the minority "increasingly critical of [Kinsey], as were their supporters in the community"; that prior to the elections, Kinsey had been "openly against the political platform and election of" the two new members and that this had been "well known to all of [the] individual defendants and to their community supporters"; and that immediately after the elections, the new majority "set out to terminate [him] ... in retaliation for his association with their political opponents." Kinsey charged, *inter alia:* that his contract was recognized by Texas law as a property interest and, contrary to the Fourteenth Amendment, had been terminated without procedural due process; and that his First Amendment rights had been violated, because he had been terminated as a result of his "active support of and association with the political opposition" to the majority, who had retaliated against him "because of his political position, and because of his speaking out for candidates of his choice". Kinsey also raised numerous pendent state law claims, including that his termination violated state law.

The district court granted summary judgment against the claims as to the Board members in their individual capacities and against the federal claims, except as to the First Amendment. It also granted the School District's unopposed motion to dismiss the pendent claims.[5] At trial on the First Amendment claim, and following Kinsey's case-in-chief, the School District moved for a directed verdict, including because Kinsey's "interest as a citizen in the exercise of whatever *speech* or *political activity* he engaged in [was] outweighed [by] the ... governmental interests in the effective and efficient fulfillment of [the

---

3. For example, Kinsey testified that shortly before the first post-elections regular Board meeting, Barrentine told him: "Tell [your father] that we're not going to fire you Tuesday night." Kinsey stated that "the implication was, 'We're not going to do it [that] night, but down the road.'" As another example, Hagler testified that Kinsey would not allow him, in his capacity as Board secretary, to remove the policy manual from Kinsey's secretary's office to a room nearby, in order to work with it.

4. The members of the majority were sued individually.

5. On appeal, Kinsey does not contest these rulings.

School District's] responsibilities to the public." (Emphasis added.) The court ruled that the motion was not granted at that time, indicating that it would reconsider it after the verdict.[6] At the close of the evidence, the School District so moved; and again, under Fed.R.Civ.P. 50(b), the district court took the motion under advisement pending the verdict. The jury returned a verdict for Kinsey, awarding him $250,000 in damages. It found by special interrogatories that he was terminated because of his "exercise of his First Amendment rights in relation to the" elections.

The district court granted the School District's Rule 50(b) motion for judgment notwithstanding the verdict, ruling, in part, that whether Kinsey's conduct was protected by the First Amendment was a question of law, which it was required to resolve based on the evidence. Upon that assessment, it held in part:

> Kinsey, as superintendent, was in a *close confidential relationship* to the board.... If the relationship between the two [is] antagonistic, the ... School District's operation may be adversely affected. The record is clear that Kinsey's relationship with the Board worsened after the ... election....

> The Court finds that such disruptions undermined the effectiveness of the School Board. Kinsey's right *to speech or political opposition* to a majority of the officials elected by the community to govern him is outweighed by the board's legitimate interest in having a superintendent with loyalty to the new board's policies and directives.

(Emphasis added.) The district court denied the School District's alternative motion for a new trial, ruling that if it was reversed, the verdict should stand. *See* Fed.R.Civ.P. 50(c)(1).

**6.** In so ruling, the court cited Fed.R.Civ.P. 50(b), which provided in relevant part that "[w]henever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." As discussed *infra,* two of the grounds presented in the motion were legal issues: that Kinsey's comments did not involve a matter of public concern and, as noted, that his interests, as a private citizen, were outweighed by the government's.

## II.

Our review is limited to the summary judgment on the Fourteenth Amendment and the judgment notwithstanding the verdict on the First.

### A.

For the latter, we address legal issues at the threshold; if we rule against Kinsey, we stop. In so ruling, we do not consider whether the termination comported with state law. Instead, we focus on the reach of the First Amendment. Kinsey's activities included not only speech, but also political association or affiliation (a form of speech). Free and open speech and political affiliation are part of the mix that molds and sustains this Nation. But, needless to say, Kinsey's exercise of those rights, as a private citizen, is not absolute, insofar as it conflicts with his role as a public employee. The protection accorded by the First Amendment to such activities is an issue we address not infrequently. Accordingly, the controlling law is well established. In applying it, however, a distinction must be made between cases involving only speech, or only political association, or a combination of the two. This case falls within the latter category.

As recently discussed in *Coughlin v. Lee,* 946 F.2d 1152 (5th Cir.1991), if only speech is in issue, the plaintiff, as a matter of law, must show: first, that it involves a matter of public concern ("determined by the content, form, and context of a given statement, as revealed by the whole record"); and second, that, "the interests of the [employee], as a citizen, in commenting upon matters of public concern [outweigh] the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 1156–57 (quoting *Connick v. Myers,* 461 U.S. 138, 147–48, 103

S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983) and *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)). If a plaintiff satisfies these issues, the case goes to the jury (on causation). *Id.* at 1157.

On the other hand, *Coughlin* provides that if political association is the only claimed reason for the retaliation, the employee is not first subject to (must not satisfy) the public concern legal issue, because "[f]reedom to associate with others for the common advancement of political beliefs and ideals is ... protected by the First and Fourteenth Amendments." *Id.* at 1158 (quoting *Elrod v. Burns*, 427 U.S. 347, 357, 96 S.Ct. 2673, 2681, 49 L.Ed.2d 547 (1976)) (ellipses in *Coughlin*). In such cases, only balancing is at the threshold (the second legal issue when a case involves only speech):

> This court has subsequently interpreted Supreme Court jurisprudence to require a court evaluating discharge based on political activity to balance the First Amendment values implicated by those activities against the possible disruptive effect on governmental provision of services within the specific context of each case. [If the employee's interests outweigh the government's,] [t]he burden of proof of causation then follows....

*Id.* (citing *McBee v. Jim Hogg County, Texas*, 730 F.2d 1009, 1016–17 (5th Cir. 1984) (en banc)).

We review *de novo* the district court's resolution of the threshold legal issue(s). *E.g., id.* at 1156; *Dodds v. Childers*, 933 F.2d 271, 273 (5th Cir.1991); *Soderstrum v. Town of Grand Isle*, 925 F.2d 135, 139–40 (5th Cir.1991). As noted, the earlier quoted allegations from Kinsey's complaint, as well as the proof at trial, leave no doubt that this case involves speech and political association. As such, it falls squarely under this court's en banc decision in 1984 in *McBee*.

*McBee* was forged by the Supreme Court's pure speech decisions in *Pickering* (1968) and *Connick* (1983) and its political affiliation decisions in *Elrod* (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct.

1287, 63 L.Ed.2d 574 (1980). *McBee*, 730 F.2d at 1011–14. There, the newly elected sheriff did not offer to reappoint his predecessor's deputies, some of whom had supported the predecessor's re-election with bumper stickers and attendance at political rallies. 730 F.2d at 1015. In addition, upon a former deputy's complaining to county authorities about her fellow deputies not being rehired, the unaccepted offer to retain her in a lesser position was withdrawn. *Id.* at 1010. The court held:

> Surveying the Supreme Court authority which we have discussed, we conclude that the standard to be applied by us in resolving such public employee discharge or non-renewal cases as this is the *Pickering* balancing test. *Each case must be considered on its particular facts*, sifting through such factors and circumstances as the *Connick* Court outlined in order to strike the proper balance between the employee's *speech and associational rights* as citizen and the state's right as an employer to loyal and efficient service. Such cases might reasonably be expected to locate themselves on a spectrum; we conclude that they do.

*Id.* at 1014 (emphasis added).

In viewing that spectrum, our court noted that cases involving only discharge for political party affiliation, such as *Elrod* and *Branti*, were "at the extreme of the employee's side, where little, if any, weighing is called for.... They did not campaign, they did not even speak: they merely thought." *Id.* For the other end of the spectrum, the employer's, our court cited *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir.1970), and *Duke v. North Texas State Univ.*, 469 F.2d 829 (5th Cir.1972), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973), "where instructors had incited student disturbances that were sufficiently serious to call in question the ability of the academic authorities to maintain order on campus." *Id.* In so doing, it quoted from *Ferguson*, written by Judge (now Chief Judge) Charles Clark:

> Here the proof before the district court showed that Dr. Ferguson exercised his rights of speech and association to such

an extent as to seriously impair, if not to destroy, his effectiveness as an instructor in an organized program of academic tutoring. This was his choice to make. The college had no right *to control his speech or to curtail his freedom of association,* but they did have a right to terminate his employment as a classroom instructor at the point where the exercise of his constitutional privileges clearly over-balanced his usefulness as an instructor.

*McBee,* 730 F.2d at 1014 (emphasis added) (quoting *Ferguson,* 430 F.2d at 859).

Based upon the facts in *McBee,* the court found a "mid-spectrum situation", calling for *Pickering* balancing, as refined by *Connick. Id.* at 1015–16. Accordingly, it provided guidelines for the district court to apply on remand. "On the one hand, the court should consider to what degree the ... [speech and association] involve 'public concerns.' On the other, the court should consider whether 'close working relationships are essential to fulfilling [the public employee's] public responsibilities.'" *Id.* at 1016 (quoting *Connick,* 461 U.S. at 151–52, 103 S.Ct. at 1692).[7] The *McBee* court "caution[ed] that [this] 'closeness'" concerned more than the number of persons involved, but, more importantly, was "a function of the particular 'public responsibility' being carried out." *Id.* If the district court found it essential for such relationships to be close, "it must then determine whether the particular speech [and other conduct] sufficiently disrupted the working relationship as to prevent effective performance, *requiring a stronger showing of disruption as the employees' speech moves closer to core 'public concerns.'"* *Id.* at 1017 (quoting *Connick,* 461 U.S. at 152, 103 S.Ct. at 1693) (emphasis added). In assessing such disruptive effect, the court should consider "the time, place and manner of the political activity" and "whether, taken in context, the particular activity should be considered sufficiently hostile, abusive or insubordinate, as to

disrupt significantly the continued operation of the office." *Id.*

■ *McBee* fell at mid-spectrum. Such is not the case here. In determining where this case should fall, in order to formulate and apply the proper balancing, we note that cases involving public employees who occupy policymaker or confidential positions fall much closer to the employer's end of the spectrum, where the government's interests more easily outweigh the employee's (as a private citizen). In *Rutan v. Republican Party of Illinois,* —— U.S. ——, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), an extension of *Elrod* and *Branti,* the Supreme Court held that "promotion, transfer, recall, and hiring decisions involving low-level public employees [could not] be constitutionally based on party affiliation and support." —— U.S. at ——, 110 S.Ct. at 2732. It further held: "A government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high-level employees on the basis of their political views." —— U.S. at ——, 110 S.Ct. at 2737 (citing *Elrod* and *Branti* ). In so holding, it noted that "[i]n *Elrod,* we suggested that policymaking and confidential employees probably could be dismissed on the basis of their political views.... In *Branti,* we said that a State demonstrates a compelling interest in infringing First Amendment rights only when it can show that 'party affiliation is an appropriate requirement for the effective performance of the public office involved.'" —— U.S. at ——, n. 5; 110 S.Ct. at 2735 n. 5.

This court's recognition that policymaking or confidential employees' First Amendment rights are more easily outweighed in balancing interests predates *McBee. See, e.g., Gonzalez v. Benavides,* 712 F.2d 142, 148 (5th Cir.1983); *Stegmaier v. Trammell,* 597 F.2d 1027, 1038–40 (5th Cir.1979). For example, this was recognized again, recently, in *Soderstrum* (1991). The chief of police had employed his nephew's wife as his secretary. Several years later, upon

---

7. *Connick* held that "[w]hen *close* working relationships are essential to fulfilling public responsibilities, a *wide degree of deference* to the employer's judgment is appropriate." 461 U.S. at 151–52, 103 S.Ct. at 1692 (emphasis added).

his defeat, the new chief did not rehire her. She sued under § 1983, claiming that the decision was based upon her political affiliation with the former chief and violated "her First–Amendment right to freedom of association." *Id.* at 137. This court stated: "The case reduces, then, to the question whether [the secretary] served in a position of confidence requiring complete loyalty to the police chief." *Id.* at 140.

An incoming government official should be able to choose his personal secretary and should not be prevented by the First Amendment from replacing his defeated opponent's secretary and relative, at least when that person, as in this case, has unambiguously expressed her lack of confidence in the incoming official and her unwillingness to work in the new administration.... Because we find that [the secretary] fits the definition of a confidential employee, we need not address whether she was correctly deemed a policymaker as well.

*Id.* at 141 (citations omitted). This confidential employee finding was based, among other things, on the fact that the secretary "was privy to certain confidential files and documents." *Id.* at 140. As quoted earlier, each of these "case[s] must be considered on its particular facts". *McBee,* 730 F.2d at 1014. Although *Rutan* and *Soderstrum* do not involve a combination of speech and political association, they are instructive for our *McBee*-guided balancing here.[8]

In applying the *McBee* factors, one consideration is the extent to which Kinsey's activities involved matters of public concern. This is not a case involving only speech, where public concern is the first of two legal issues. This notwithstanding, the tests applied to determine whether speech is of such concern are instructive. As stated in *Coughlin*, "[i]ssues rise to the level of public concern if an individual speaks primarily in his role as a citizen rather than as an employee, or if the information conveyed is of 'relevance to the public's evaluation of the performance of governmental agencies.'" 946 F.2d at 1157 (quoting *Day v. South Park Indep. School Dist.,* 768 F.2d 696, 700 (5th Cir. 1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986) (footnote omitted)). Notwithstanding Kinsey's interest in retaining his position as superintendent, his speech and association involved matters of great public concern—the performance of elected officials. Needless to say, his activities, especially the views he expressed in numerous conversations with Salado residents, were most relevant in evaluating the performance of the Board.

Another consideration is whether a close working relationship is essential. Kinsey occupied a high-level policymaker position. Under Texas law, the Board is a corporate body with the exclusive power to manage and govern its district's schools. V.T.C.A. Education Code § 23.26 (1987). It employs the superintendent, *id.* § 23.28, who "is the educational leader and the administrative manager of the school district." *Id.* § 13.-351(a) (Supp.1991); *compare id.* § 13.352(d) (detailed responsibilities for principal as opposed to general statement for superintendent). *See Stegmaier,* 597 F.2d at 1027, 1035 (policymakers may be identified, in part, "as public employees whose responsibilities require more than simple ministerial competence, ... and whose discretion in performing duties ... is not severely limited by statute, regulation, or policy determinations made by supervisors"). "[C]onsideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals." *Gonzalez,* 712 F.2d at 149 (*quoting Elrod,* 427 U.S. at 368, 96 S.Ct. at 2687). One of Kinsey's primary duties was to advise the Board. He met with it in executive session and offered opinions and

---

**8.** *Coughlin* did involve speech and political association related to an election; but the plaintiffs, former deputy sheriffs, did not occupy policymaker or confidential positions. At the close of their case, a directed verdict was granted the defendant sheriff on the basis that the speech (surreptitiously providing damaging information to the media) did not address a matter of public concern. 946 F.2d at 1156. We affirmed the directed verdict on the speech claim, but reversed and remanded on the association aspect, because the directed verdict did not address it and proper discovery for it had been denied. *Id.* at 1158–60.

recommendations to guide its decisions. Kinsey also handled the School District's finances, and made recommendations to the Board on hiring teachers and principals. And, because the Board can act only by majority vote at duly called meetings, it was dependent upon Kinsey, its chief administrator, to implement its policies and decisions. *See Stegmaier,* 597 F.2d at 1035 (policymaker also identified as employee whose decisions create or implement policy).

Therefore, he possessed the power to "make or break" Board policies which "arguably afforded him the opportunity to thwart or to forward [its] goals". *Gonzalez,* 712 F.2d at 149. In addition to occupying a sensitive, high-level policymaking position in relation to the Board, Kinsey occupied a confidential relationship. *See Soderstrum,* 925 F.2d at 140–41; *Stegmaier,* 597 F.2d at 1040 (deputy circuit clerk held confidential employee). During executive sessions, he could be called on to advise the Board on matters relating to real property transactions, personnel grievances and hearings, student discipline cases, and other confidential matters. Vernon's Ann.Texas Civ.St. art. 6252–17, § 2(f), (g), (h), (j), (m), and (r) (Supp.1991). Moreover, he was custodian of the Board's confidential records. *Id.* art. 6252–17a § 5(a) (Supp. 1991). These could include personnel and litigation files, sealed bids, drafts and working papers in the preparation of proposed rules and policies, student records and other confidential documents. *Id.* art. 6252–17a § 3(a)(2), (3), (4), (5), (11), (14), (17), and (22) (information deemed confidential by Texas Open Records Act).

█ In sum, a close working relationship was essential. Kinsey concedes this (in his en banc brief): "the relationship between the board of trustees of a school district and its superintendent is, of necessity, a close one." Accordingly, we turn to whether his activities "sufficiently disrupted the [close] working relationship as to prevent effective performance". *McBee,* 730 F.2d at 1017. Toward that end, we are guided by this case falling very close to the employer's end of the *McBee* spectrum. Kin-

sey's activities touched on matters of great public concern; but, because his position was so high-level and confidential, not much opposition to the new majority was required in order to disrupt, and prevent, effective performance.

In determining disruption, one factor we consider, as instructed by *McBee,* is the "time, place and manner of the political activity". *Id.* Kinsey's association and position in the elections was well known. *He was the issue.* As he admitted, he expressed his concerns about the Hagler slate to anyone who asked him; and he did so on numerous occasions. His published letter to the newspaper was for the purpose of demonstrating his support for Berry. Admittedly, considering the last of the *McBee* disruption factors, his conduct was neither "hostile, abusive or insubordinate [so] as to disrupt significantly the continued operation of the office", *id.;* but, there can be no doubt that as a result of his activities, he could not have an effective relationship with the Board. His relationship with Barrentine and Hagler had been adverse to begin with. This had developed well in advance of the elections, in which he opposed Hagler's re-election. Accordingly, Kinsey's "First Amendment rights [do not] outweigh the [Board's] interest in the effective provision of public services." *Coughlin,* 946 F.2d at 1157.

In short, in light of his high-level policymaker and confidential position, Kinsey stepped over the line. As observed in *Ferguson,* "[t]his was his choice to make." 430 F.2d at 859. But, in so doing, he abandoned any shelter otherwise provided him by the First Amendment. Because Kinsey fails the *McBee* balancing, this case should not have been submitted to the jury. Therefore, the district court correctly granted judgment notwithstanding the verdict.

**B.**

█ Contrary to the summary judgment, Kinsey maintains that he was denied procedural due process under the Fourteenth

Amendment.[9] He must first establish deprivation of a constitutionally protected property interest. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). Otherwise, we do not consider "what process is due". *Id. Accord English v. Hairston,* 888 F.2d 1069, 1070 (5th Cir.1989); *Darlak v. Bobear,* 814 F.2d 1055, 1061 (5th Cir. 1987). Although relieved in September 1988, Kinsey received full compensation through June 1990. Because of the compensation, the district court held that Kinsey had not been deprived of the requisite interest. He contends, however, that he possesses a property interest in the non-economic benefit of the duties and responsibilities as superintendent.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). "Property interests in continued employment 'are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law.'" *Soderstrum,* 925 F.2d at 138 (*quoting Roth,* 408 U.S. at 577, 92 S.Ct. at 2709). Kinsey is unable to cite any provision of the Texas Education Code, or other source, which bestows a property interest in the *position* of superintendent. And, as this court held in *Davis v. Mann,* 882 F.2d 967, 973 n. 16 (5th Cir.1989) (*quoting Jett v. Dallas Indep. School Dist.,* 798 F.2d 748, 754 n. 3 (5th Cir.1986)), "unless the state 'specifically creates a property interest in a noneconomic benefit—such as a work assignment—a property interest in employment generally does not create due process property protection for such benefits.'"

Davis claimed that he had been deprived of a constitutionally protected property interest when he was dismissed from the residency program at the University of Mississippi Dental School, allegedly in re-

taliation for exercise of First Amendment rights. This court held:

> [W]e need not inquire what process was due or whether that process was afforded Davis prior to his termination from employment, because it is undisputed that Davis received his full salary under his employment contract. We have found that an employee suffers no compensable damage from an early employment termination where he has been paid his full salary for the contract year.
>
> ....
>
> We also find no support in the case law for Davis's claim that he is entitled to the duties and responsibilities of his employment as specified under the contract.

*Id.* at 973 (*citing Robinson v. Boyer,* 825 F.2d 64, 67 (5th Cir.1987) (plaintiff fully compensated when he received his full salary for the contract year); *Jett,* 798 F.2d at 753–54 (contract did not "create a property interest in the intangible, noneconomic benefit of [plaintiff's] assignment as coach")). *See also Cannon v. Beckville Indep. School Dist.,* 709 F.2d 9, 11 (5th Cir.1983) (superintendent terminated without hearing did not have due process claim, because he had been paid "the full amount due him under the existing contract").

Kinsey did not have a constitutionally protected property interest in the non-economic benefit of serving as superintendent. Accordingly, we do not reach his contention that he did not receive due process.

### III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

\*    \*    \*    \*    \*    \*

Circuit Judges KING and WIENER, concur in the judgment.

PATRICK E. HIGGINBOTHAM, Circuit Judge, with whom POLITZ, GARWOOD and W. EUGENE DAVIS, Circuit Judges, join specially concurring:

I write separately because I reach the same conclusions as the plurality, but by a

---

9. We review a summary judgment *de novo,* using the same standards as the district court. *See* Fed.R.Civ.P. 56; *see, e.g., Crenshaw v. Gen-* *eral Dynamics Corp.,* 940 F.2d 125, 127 (5th Cir.1991); *Texas Commerce Bank–Fort Worth v. United States,* 896 F.2d 152, 155 (5th Cir.1990).

different path, both parallel to the plurality's approach and not foreclosed by it.[1] Trustees of the Salado School District could deliver on the mandate of their election only through Superintendent Kinsey. They were entitled to a superintendent who shared their management philosophy. This superintendent did not. To the contrary, Kinsey and the newly elected board held diametrically opposed views on their respective roles in management. Certainly, the board was not obligated to hire a superintendent who did not share their philosophy, and the first amendment does not require them to retain such a superintendent.

This trumping of state interest over first amendment interests is expressed in a judicial creature—a policymaker. Such a policymaker cannot secure job tenure under the first amendment by publicly espousing his antagonizing philosophy or by engaging in other political activity in its service. Doubtless, such activity will enjoy the protection of the first amendment for many purposes, but it will contain no job security. As we have explained:

> There is a governmental interest in securing those unique relationships between certain high level executives and the elected officials at whose grace they serve. For this narrow band of relationships, refusing to grant First Amendment tenure would seem to take away little freedom not already lost in accepting the appointment itself, at least when the appointive job has the sweep of authority and discretion as to be central to the elected official's duty. The holder of such a position can hardly have any reasonable expectation but that his policy choices must publicly fall within the protective license issued by his appointing officer. To say that loss of that job is the price for his public declaration chills little.

*Gonzalez I*, 712 F.2d at 148.

Of course, a public policy official may not be fired for first amendment protected activity unrelated to his mission unless that activity would frustrate performance of his tasks. This poses a different inquiry. If, for example, public policy officials were to speak out about public issues, we would proceed with the balancing inquiry of *Connick*. As we explained in *Gonzalez*:

> If [the government interest in having loyal policymaking employees] is implicated the trial court should then weigh that interest against the asserted rights of free speech. That weighing is required because we do not decide that all speech by persons in such relationships is unprotected. Rather, the speech must be weighed against its impact upon the relationship and that relationship's role in the elected official's discharge of his duties.

*Id.* at 150.

When, however, a policymaker is fired because of views related to his mission, there is no further weighing, whether or not these views have been publicly espoused. In a practical sense, the balances have already been struck by the categorization of a worker as a policymaker. *See Hall v. Ford*, 856 F.2d 255 (D.C.Cir.1988); *Soderstrum v. Town of Grand Isle*, 925 F.2d 135 (5th Cir.1991). Categorization versus balancing is familiar to first amendment jurisprudence. Although they both require accommodating competing values, they differ in that the policymaker categorization strikes the balance across cases, whereas the *Connick* balancing is from case to case. Categorization also shifts the case by case decisional process to definition. It puts a premium on definition. The Supreme Court has softened the procrustean bite by requiring the state to demonstrate not only that a worker was a "policymaker" or held a "confidential" position, but also whether conformity of view is job related. As Justice Stevens put it:

> The ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

---

1. I fully concur with the plurality's treatment of the property issues.

*Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1979).

This case has none of the problems of defining at the margin nor of job relatedness. Kinsey's vision of respective roles of board and trustees need not be swallowed by the board. They go to the heart of the job. Stated another way, it is plain that a common vision of their respective roles is "an appropriate requirement for the effective performance of the public office involved," *id.* at 518, 100 S.Ct. at 1295. This, for me decides this case.

GOLDBERG, Circuit Judge, with whom JERRE S. WILLIAMS, Circuit Judge, joins dissenting:

    And I honor the [person] who is willing to sink
    Half his present repute for the freedom to think,
    And, when he has thought, be his cause strong or weak,
    Will risk t' other half for the freedom to speak.[1]

I revisit Salado and, again, sound the schoolbell for the freedoms protected by the First Amendment. The plurality relegates a school district's "educational leader and . . . administrative manager" to an almost unspeakable role. Tex.Educ.Code § 13.351(a) (Vernon 1991). The constitutional evil of today's decision is that it summarily strips the superintendent of a badge of citizenship—the right to participate publicly in an election. The jury found that the Salado school board would not have discharged the superintendent but for his public expression during the election. The plurality punishes Kinsey by forcing him to stand in the corner like a small schoolchild and silently observe while his neighbors, friends and colleagues debate the election issues and candidates amongst themselves and in the pages of the town newspaper.

The lesson this decision teaches is unmistakable. By permitting the school board to censor the superintendent's speech which he delivered in reasoned and measured terms, the court enforces a constitutional curriculum of authoritarianism rather than autonomy, suppression rather than speech, and public facade rather than public discourse. I do not believe the Constitution prescribes so cramped a lesson plan. I respectfully dissent. I confine this dissenting opinion to a succinct consideration of the overarching issues posited in the plurality opinion of the en banc court and the special concurrence. Much has been said that need not be repeated. I stand on the propositions of law and the analysis of facts articulated in the panel majority opinion, and neither repeat nor redact that previous writing.

I.

In *Kinsey v. Salado Indep. School Dist.,* 916 F.2d 273 (1990), the panel majority applied this circuit's public employee speech and affiliation jurisprudence, as the en banc plurality does today. Although I utilize the same grading scale as the en banc plurality, I ultimately give Kinsey the highest grade in the class. The plurality, however, awards top honors to the school board. We quarrel not about the assigned task, but about the correct balancing test and answer dictated by the Constitution.

I note that our discourse on the designated subject contains certain similarities. Kinsey's activities certainly "involved matters of great public concern." Plurality op. at 995; *see Kinsey,* 916 F.2d at 278 (Kinsey's statements concerned the public election of the school board, which became an issue "of great public importance" in Salado) (citation omitted). Since "a school superintendent and [the] school board stand in a close and confidential relationship," a close working relationship between Kinsey and the school board was essential to fulfilling the school board's responsibilities to the public. *Kinsey,* 916 F.2d at 280; *cf.* Plurality op. at 995–96 (concluding that Kinsey "occupied a high-level policymaker position" and "a confidential relationship").

The examination administered by the en banc plurality differs in several crucial respects from that proctored by the panel

1. James Russell Lowell, A Fable for Critics    (1848).

majority. The en banc plurality emphasizes, and I recognize, that the First Amendment rights of a "confidential employee ... are more easily outweighed" by the interests of the government than the First Amendment rights of a *non*-confidential or *non*-policymaking employee. Plurality op. at 994–95 (citations omitted). From this proposition, however, the plurality crafts a balancing test that vulnerably slants toward the employer's end of the spectrum. "Kinsey's activities touched on matters of great public concern; but, because his position was so high-level and confidential, *not much opposition to the new plurality was required in order to disrupt, and prevent, effective performance.*" *Id.* at 996 (emphasis added). A confidential employee is doomed to fail a test weighted as heavily as that devised by the plurality.

This is the point where the panel majority's preparation of the exam diverges from that of the en banc plurality. I agree that the correct query is "whether the particular speech [and other conduct] sufficiently disrupted the working relationship as to prevent effective performance" of the school board's responsibilities to the public. Plurality op. at 994 (citations omitted). The court quotes, but seemingly disregards, the language we deem critical to this balancing analysis: "[A]s the employee['s] speech moves closer to core 'public concerns,'" the law requires a " '*stronger* showing of disruption'" by the government. *Id.* "Kinsey's speech during the school board election was at the heart of First Amendment protection," so the school district bore a heavy burden to prove that Kinsey's activities so disrupted the working relationship as to prevent the efficient ful-

fillment of the school board's duties to the public. *Kinsey,* 916 F.2d at 280.[2]

*McBee* instructs us to consider two factors in determining whether the sufficient level of disruption occurred in the particular context of this case. Neither of the factors decisively tips the balance toward the government, even if we begin, as the plurality does, with a test overly weighted toward the employer's end of the spectrum. The "time, place and manner of the political activity" weighs in Kinsey's favor. *McBee v. Jim Hogg County,* 730 F.2d 1009, 1017 (5th Cir.1984) (en banc). He merely conversed with other citizens concerning the upcoming school board elections and expressed his support for Berry in a letter published in the local newspaper. *Kinsey,* 916 F.2d at 278. In its analysis of the second factor, moreover, the plurality admits that the particular activities could *not* be considered sufficiently " 'hostile, abusive or insubordinate [so] as to disrupt significantly the continued operation of the office.' " Plurality op. at 996 (quoting *McBee,* 730 F.2d at 1017). Despite this explicit indication that it should shift the balance back toward the employee, the plurality concludes that "there can be no doubt that *as a result of [Kinsey's] activities,* he could not have an effective relationship with the Board." *Id.* (emphasis added); *see Thomas v. Carpenter,* 881 F.2d 828, 831 (9th Cir.1989) ("disruption must be 'real, [and] not imagined' ") (citation omitted), *cert. denied,* 494 U.S. 1028, 110 S.Ct. 1475, 108 L.Ed.2d 612 (1990). The record, however, demands precisely the opposite deduction.

"[T]he School Board failed to prove that *Kinsey's public statements* adversely affected his working relationship with the School Board."[3] *Kinsey,* 916 F.2d at 280.

---

**2.** *Cf. Gonzalez v. Benavides,* 774 F.2d 1295, 1302 (5th Cir.1985) (protecting speech that "directly address[ed] matters of substantial concern" because speech did not significantly harm relationship with publicly elected officials, although public employee occupied sensitive, high-level position), *cert. denied,* 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986); *Gonzalez v. Benavides,* 712 F.2d 142, 148 (5th Cir.1983) (weighing required because court did "not decide that all speech by persons in such relationships [which

require for job security loyalty at the expense of unfettered speech] is unprotected").

**3.** I do not deny that the relationship between Kinsey and the school board deteriorated during the school board election and the subsequent decision to relieve Kinsey of his duties as superintendent. The record does not link the disruption to Kinsey's affiliation or speech. *Kinsey,* 916 F.2d at 280 & n. 7.

Kinsey never publicly disavowed the school board's authority over him, but merely expressed in verbal and written form a reasoned preference for one school board candidate over another. Nor did Kinsey personally attack any of the new school board candidates. Nothing in the record supports the notion that Kinsey acted in an insubordinate manner toward the school board. In the aftermath of the election, Kinsey publicly pledged to *support* the school board. When the newly-elected school board issued specific directives, Kinsey attempted to comply with each directive. Nothing in the record shows noncompliance with any of the directives. *Cf. Gonzalez,* 774 F.2d at 1303 (holding that polite exchanges, lack of personal attacks, and offers to cooperate with employer showed that speech did not and was not likely to disrupt the government's operations). Kinsey testified that the school board never informed him that he had done anything wrong in carrying out his duties as superintendent. *Cf. McBee,* 730 F.2d at 1015 ("no evidence that their previous political activity actually interfered with the effective performance of their jobs").

The plurality posits a test that Kinsey could never pass. The plurality wholly relies on the one factor that weighs in the school board's favor, the right of the government employer to loyal and efficient service, and essentially disregards the other factors that support Kinsey's speech and associational rights.

> The character of the expressions [cannot] be ignored: the Constitution has not repealed human nature; and it is one thing to work with a subordinate who has expressed a reasoned preference for another superior and quite another to have forced on one's organization an individual who has blackguarded one's honesty and ability up and down the county.

*McBee,* 730 F.2d at 1017. The test formulated by the plurality ascertains the high scorer not by balancing, but by assigning a grade predetermined by the perceived nature of the relationship between the employee and the publicly elected officials. Such a test seems unfaithful to the balancing approach prescribed by our jurispru-

dence. *Id.* at 1016 (" 'First Amendment issues ... not answerable by mechanical formulae' ") (citations omitted).

## II.

The special concurrence advocates a test that bestows the highest score not by blind grading, but by favoritism. This bright-line test first asks if the employee's "party affiliation is an appropriate requirement for the effective performance of the public office involved," and, if the answer is "yes," forces that employee to step over the line into a category of public employees dischargeable solely for "views related to the employee's mission"—whether or not the employee *expresses* those views. This is the approach taken in the pure affiliation cases, but with a nod to expression flowing from the affiliation.

Almost ten years ago, this Court recognized the government's need for the political loyalty of certain high-level employees, not just to ensure effectiveness, but to prevent the obstruction of the "implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Gonzalez,* 712 F.2d at 148 (citing *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 2687, 49 L.Ed.2d 547 (1976)). Yet we adhered to the balancing approach, holding merely that this important governmental interest should be *weighed* in the balancing process. *Id.* at 148, 150. I do not read *Gonzalez* as limiting the mandate to balance these competing interests to cases involving employees that voice views "unrelated to their mission"; rather, the balancing focuses on whether the speech involved matters of "public concern," a term that might include views *both* related and unrelated to the particular employee's mission.

*Gonzalez* and *McBee* teach that we should weigh the employee's speech and associational interests against the impact on the relationship between the employee and the elected officials and the relationship's role in the elected officials' discharge of their duties. *McBee,* 730 F.2d at 1016; *Gonzalez,* 712 F.2d at 150. The panel majority did so. *Kinsey,* 916 F.2d at 280.

Yes, Kinsey's views were "related to his [educational] mission." But the views were of "great public concern." And I emphasize that the record shows that Kinsey's activity did not catalyze any dissention in his relationship with the school board. That is precisely why the panel majority, in the final analysis, could not "den[y] the electorate ... access to his unique point of view." *Id.* at 281.

The categorical approach endorsed in the special concurrence is fueled by the fear that the balancing test provided by our jurisprudence will allow a high-level employee to "secure job tenure under the first amendment by publicly espousing his antagonizing philosophy or by engaging in other political activity in its service." Special Conc. at 998. As noted by the panel majority, however, requires the fact-finder to determine whether the employer would have suspended or fired the employee *regardless* of the protected speech." *Kinsey,* 916 F.2d at 281 n. 9, citing *Mt. Healthy [City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)] (emphasis added). Elected officials confronted with an employee engaging in activities protected by the First Amendment can terminate the employee for an otherwise valid reason—but that is not what happened in Salado. The record supports the conclusion that the school board would *not* have terminated Kinsey but for the public *expression* of his political affiliation.

### III.

Few things are as desirable in an election as free and open debate. Few people are likely to be as well-informed on matters of educational policy and school board composition as a school superintendent. Yet the effect of today's ruling is to deny the public its right to hear the opinions of its superintendent on these issues. No concern for the efficient functioning of the school district requires that every drop of dissent be squeezed from its educational leaders.

The school term has drawn to a close, and I must bid farewell to Salado. I hope that this course marks not the end of a semester, but the beginning of a short recess. I yearn for the resolute return to a constitutional curriculum that will disavow today's denial of Dr. Kinsey's First Amendment rights and teach Salado's children of the precious freedoms promised in the First Amendment.